Good morning, Your Honors. May it please the Court, Laura Merrigan here on behalf of Cosmo Colaruotolo, the petitioner-in-claimant. Mr. Colaruotolo has established that he suffered injuries to his lumbar spine and cervical spine under the Longshore Act and is entitled to benefits. He has an extensive orthopedic injury history, including fusions to his cervical spine, fusion surgeries to his lumbar spine, two shoulder surgeries, and bilateral total knee replacements. The overarching question before the Court today is whether, taking into consideration all of these conditions, the employer has shown that there are jobs available to Mr. Colaruotolo that he can do. This is a somewhat unusual case in that there are both factual and legal issues on appeal, and of the factual issues, there are multiple reasons for reversal. Now, I understand that there are reasons to reverse a decision because a factual error is a higher standard than a legal error, but because this case is unusual in that regard, that's where I'd like to start. So I'm going to plan to dash through the factual issues and then dive into the legal issues, time permitting. But of course, Your Honors, given that I only have 10 minutes here, if there is a point that you would most like me to address, I'd be very happy to defer to that. In regard to the factual issues, perhaps the most striking and, frankly, a little bit strange is that Mr. Colaruotolo testified that he could not do the tower clerk job. The tower clerk job is the job that the ALJ held that he could do. Now, he said there were two reasons that he could not do it, and this was based on his experience from having tried to do it before the injury, because his condition was already such before the injury that he found it to be too painful. He had two reasons. One, his back, and two, his neck. The ALJ, in repeatedly citing his testimony about his back and his neck, actually took out the word neck, substituting an ellipsis, such that in looking at the tower clerk physician and why it had hurt him to do it before, he only considered the back. And what is the, remind me, what's the problem with the neck that doing the tower clerk job causes? Your Honor, the problem is that he has a cervical spine fusion, so his vertebrae are fused together. There are two monitors that he has to look at for the 10-hour shift. One has the pictures of things like the license plates and the container numbers. The other is a monitor that he has to enter all the information into. So for, it's an 80% active shift, so there's 20% spread out downtime throughout the day. And so for 80% of these 10 hours, he's looking back and forth and back and forth between the two monitors all day long with a neck fusion. He said that that caused him pain in his neck like, quote, you wouldn't believe. Now the ALJ didn't discuss. Can't swivel his chair? It's unclear, Your Honor. There were a variety of workstations discussed. Some of them didn't have a swivel chair, is that the argument? Some of them involved a stool. They have swivel stools, too. I mean, I don't know. I'm just, I'm not, I mean, I am quibbling, but it just seems strange that the argument is that he would have to turn his neck. I mean, it'd just be as easy to turn a stool, wouldn't it? Perhaps, Your Honor, but the record's silent on that point. It doesn't address which types of chairs there are and whether they swivel or what effects swiveling back and forth all day. But I thought there was some sort of, I don't have it before me, but some sort of ALJ indication that there were ways in which those could be dealt, that kind of concern could be dealt with. Is that not in there at all? Your Honor, I don't believe so. The ALJ addressed the fact that sitting hurt his back because in doing the tower clerk job, he found that he actually had to sit for most of the day despite the vocational expert's testimony to the contrary. Counsel, I was puzzled about the tower clerk position because he testified that this would nearly double his salary if he took that position. Now, that was based on five days a week. Is that correct? Double it from almost $70,000 to $130,000 a year would increase his pension as well. So it looks like it might be a very desirable job. Yes, Your Honor. In fact, I believe the testimony is that it's one of the most desirable on the waterfront because it's so accommodating. That had to do with him switching unions. So he was a member of the longshoremen's union, local 13, and in order for him to do that work, he'd have to become a member of the clerk's union, local 63. This was slated to happen a month after his injury, and so the change of union would have been accompanied by the increase in salary. Would it come with increased availability of the position as well if he switched unions? Did the clerk's union get priority? Yes, Your Honor. The way that the job works is it first goes to the clerk's union, and only if none of the clerks take this highly desirable tower clerk job, then it passes to the next union. The next union is not necessarily his union. It could be the mechanic's union or the carpenter's union, if it happens to be available, and if it happens to go to local 63. There was some testimony. I understand you challenge it, but there was some testimony that it would be available basically on a three-day-a-week basis. Questionable whether four or five, but three days a week would be available, and it wasn't a guarantee. It was a prediction. That's in the record, isn't it, or not? Yes, Your Honor. The vocational expert, Howard, said that. There's some evidence that would support it. You're just arguing it's not substantial. Is that the idea? Correct, Your Honor. I'm arguing that it's too speculative, and I hope that the court forgives me for doing so, but I took the unusual step. Well, but that's normally, I think, what we would defer to an agency fact finder to make those kinds of factual judgments based on the evidence that's before them. We give deference to that under the scope of review. Yes, Your Honor, and there are two reasons, though, that the ALJ's decision does not meet those standards here. One of them is to take a step back to the issue of the ALJ not addressing his neck pain with looking back and forth between the monitors. Under the Administrative Procedures Act, which is 5 U.S.C. 557, it's required that the ALJ discuss all material facts and make findings in that regard, including credibility findings. And he did find, Mr. Colaru, a total of incredible. He did say that there were several mechanisms by which the physical demands could be modified to accommodate the petitioner. Does he have to go through and list them in order to meet your reading of the APA? I believe that he at least needs to discuss the different body parts rather than omitting one with ellipses. The ALJ, in fact, at one point stated the only problem that Mr. Colaru had with the tower clerk job was his lower back from sitting, and it's provably false. Mr. Colaru listed two problems. The ALJ said, quote, there was only one. Could I ask a question? I think I understand your argument in that regard. The one thing that puzzled me is this concept of retiring from the union. What's that mean? So at some point, if a union member is injured, they can take, and it doesn't have to be injured through the job, injured for any reason. I just wonder what it means to retire from the union. What does that mean? It means you're no longer in the union, but you can still work, or what? My understanding, Your Honor, and the record doesn't delve into this too deeply, is that you can pull a pension and, yes, in return, you sacrifice your ability to pull jobs from the board. So it means retiring from work then? Yes. So you call it retiring from the union, but it's really retiring from work. So if he retired, what's the theory about? Why are we arguing about whether he can go back to work? I just don't understand the scheme that's going on here. So, Your Honor, to back up for a moment, I may have misspoken. It's not necessarily retiring from work altogether. Someone can retire from the union. For example, there's a case that was just decided by the Fourth Circuit. It's Moody v. Huntington Ingalls. There's a similar issue pending before this Court in a case that's Christie. I'm not asking about the cases now. I'm wondering about what retire from the union means. Yes, Your Honor, and those cases look into whether retiring from the union is retiring from work. Moody holds that no, retiring from the union is not necessarily retiring from work as a whole. There can still be wage loss after retirement. So I'm not sure what that means. So if you retire from the union, which I don't know what that means. It doesn't mean you leave the union. It doesn't mean you're no longer a union member, or it does? I believe that it does, Your Honor, but the record really doesn't delve into these aspects of medical retirement. You rely in part on the fact that he's retired from the union and that will affect the ability of him to do this work. But you really can't explain how that works? It does mean that he cannot show up at the union tomorrow and pull from the casual board. Well, then, does it mean that he can't legally or he can't in order to keep his union status or that he can't physically? I don't know what it means. If it means that he can't meet the requirements of this statutory scheme, then that's the end of the case, but it can't mean that. Your Honor, it's something that you technically do under the union wherein you stop paying dues and you start drawing a pension and you stop being eligible. And you do that and still work? Not through the union. So he's indicated he doesn't want to work anymore, and the issue is just whether if he did want to work, this job would be available to him. Is that right? So we don't really need to worry about whether his neck hurts. It's just an abstract question about whether he could be assigned to work there or whether we could contemplate that he could work there in order to decide whether he gets a certain amount of money while he's not working because he's not going to work either way. Is that what's going on here? Right, Your Honor. Because he's medically retired, as a practical matter, that job is not available to him. Right. But what I'm saying is that says that he can't actually do the job, but under this statute we have to see whether there's a job that would be available to him if he wasn't retired from working. Exactly, Your Honor. Is that what we're supposed to do? Exactly. And it's similar to the question. It's sort of an abstract inquiry. I mean, he's not really going to have to go in and try to do this three days a week. Is that right or wrong? I don't understand. He can't go in and do it three days a week. But I would argue, Your Honor, this Court should adopt a legal test wherein if a claimant takes medical retirement and flips that switch such that they can no longer take jobs through the union and they make that decision because of a work-related injury and their reasonable belief that they can no longer work. That's binding. Then that should change the labor market. Because here we had a judge who determined that he could no longer work before changing his mind. We had a benefits review board administrative appeals judge who dissented. It can't be right, or maybe it is, it can't be right under the scheme that he can say that a person who says I'm entitled to this benefit, the one that we're reviewing the administrative decision as to whether he gets this benefit or not, that he can determine, he can cause the determination to be yes, you get the benefit by saying I'm not going to work anymore. That can't be the case, right? Instead you ask could he work, right? There actually is case law that shows that a claimant can change the job market. For example, if they move, a claimant might live here in L.A. and then move to Montana. As long as that move is justified and reasonable and not for a fraudulent purpose. That's right, but can he move to retired status and then say I can't work because I'm retired? It does similarly narrow the jobs that would be available to him, Your Honor. Well, yeah, there's not too many people who want to hire someone who's going to stay retired. Well, I mean the retirement only applies as to the union. He could work. It would narrow the job market much like moving to Montana from Los Angeles would. But it feels like sort of a self-help provision. That is I'm going to change the legal landscape by retiring, and by retiring and not being available to work, I'm going to make my case stronger. And that feels like a bootstrap that somehow isn't fair. Well, this is exactly it. This was not a good deal retirement. He really, he's not gaming the system. If that were his intention, he would have done it. It just feels like the inquiry up or down ought to be before he retired, before he made that decision, and he made that decision knowing that he had lost before the Benefit Review Board. I understand there was a dissenting member, but it seems high risk to go and say, well, I'll take my chances on this getting reversed on appeal. But that is, I think, the risk that he takes. I don't think he gets to say, well, I'm now retired and could never return to that job, so please don't affirm because I can't go back and work now. Again, it feels like a little self-help. The decision to medically retire was taken in the three years before the ALJ reached a decision. Right. But then I think this is a straight-up question. Was the board correct? And we have to measure that, I think, as of the time that the board made the decision. So I think the question is, is the job available? Was he suitable for the work that may or may not have been available? Your Honors, I see that I'm well past my time. I'm going to give you a couple of minutes for rebuttal because we've consumed a lot of your time. Thank you, Your Honors. Let's hear from SSA Containers. May it please the Court. First and foremost, Your Honor, I'd like to just address the retirement issue. The evidence in this case would reflect that the claimant retired on October 1, 2011. What's interesting about that date is he was already in the process of litigation. He already knew that wage loss benefits were applicable in this case, and if he retired for all intents and purposes, he was really eradicating any residual wage earning capacity. So he had an economic gain. I don't want to say that was his motive, but clearly he did have an economic gain. But what's interesting in this particular case is the administrative law judge who heard the case, who made all of the credibility and factual determinations, he found that the claimant's medical condition reached permanent stationary status on August 9, 2011. So that's maximum medical improvement. So August 9, 2011 predates October 1, 2011. The administrative law judge at that time found he could return to work, he could work as a tower clerk, and that the job was available to him three days per week. And that's sort of on the hypothetical assumption that he's not retired? Because you can't work and be retired at the same time, right? Understood. But please recognize at the time of the trial, the administrative law judge was already aware of the fact that the claimant did retire on October 11, 2011. Right. So presumably the decision that the administrative law judge was making was hypothetical. Could you work if you were not retired? Yes. Is that the inquiry that we're asking here? I would agree with that. So my question, your answer to my question before, is this is an abstract question we have to ask. Could he work? And if he did, would he have work three days a week? But nobody's actually expecting that he'll ever do that. Is that right or not? I will acknowledge since he retired, once he retires, he gives his union book back to the union hall so thus he can't be dispatched to other union jobs. I'm not sure that answered my question. Okay. So can he, if we decide this one way or the other, is that going to affect whether he actually goes to work or whether he could go to work if he hadn't retired? Those are two different questions. I'm just curious to know what we're deciding here. Are we deciding an abstract? Well, you could do that. You could say, if you weren't retired, could you do this job? And that determines how many benefits you get. Or we could say, you could do this job, and we actually think we're actually deciding whether you need to go and try to do this every day. Understood. The administrative law judge reached that conclusion by saying he could return to work effective August 9th, 2011, as a tower clerk. As a retired person, he could work. The administrative law judge already knew he retired and still made that decision. He could return to work. So doesn't that just suggest, then, that the question of retirement is really irrelevant to what's before the court today, and all we really have to decide is whether the ALJ affirmed by the board is correct? I believe that is the issue. It's a straight-up question. Yes, I do believe that's the issue. All right. It seems to me that there's a couple of questions here. One is the question of suitability. That is, could he really do the job in the tower? And the other is the question of availability. That is, did Stauber correctly understand what the availability of this job was? And it seems to me that Stauber is a bit of a weak link in your case. The handwritten notes that are in the record don't really support what Stauber said he remembered the claimant saying. And if all of this is based not on what Stauber knew about the availability of the job but what he thought the claimant had said, then it seems like he's on pretty weak ground as to how many days a week he can actually get this job. Well, Your Honor, I believe Mr. Stauber stated with specificity that he could do the job three days a week. Now, you point to the claimant. Well, Stauber clearly said that with specificity. But what's the basis for his opinion? Well, he spoke to the claimant. The claimant himself told him the job would be available three to five days a week. Right. But he also said that was the basis of his handwritten notes, which we have in the record, and which say that it was rarely available. That doesn't sound like three days a week. Well, the notes are offered into evidence during the deposition that Eric Dupree took of Mr. Stauber. He really didn't delve into that information. So this is information that could have been developed at the time of trial, and it wasn't developed. And you know what's interesting is the claimant is coming before this court, and he's trying to challenge factual determinations by the administrative law judge, credibility determinations by the administrative law judge. Well, what's interesting is he does have a remedy. If the claimant perceives he's permanently and totally disabled, he could pursue a Section 22 modification claim. That would allow him to have a new hearing in front of the administrative law judge, present new evidence, and establish he's permanently and totally disabled. For the life of me, I cannot figure out why the claimant did not pursue that route, which is in the avenue of bailout. How is this responding to the question about availability? Have you just moved on from that? Oh, no, I didn't. I thought I answered it. Right, but that's not Stauber's independent conclusion. Stauber didn't go out and say, I walked the docks for, you know, two weeks, for a month, and talked to the union of folks, and here's the day-by-day account of how many jobs would be available, and Mr. Kolaruotolo would have qualified on the first week for four days, the second week for three days, and the third week for three days. It looks like at least three days a week he would be able to get employment there. That's not what Stauber says. Stauber is not testifying about anything that he knows independently. He's saying, well, I talked to Mr. Kolaruotolo, and he told me that it might be available three days a week, so I believe him. That's not really expert testimony. Well, I understand, Your Honor, but in addition to his discussions with the claimant, he also had discussions with other union clerks. He also had discussions with other terminal managers. I don't see any of that reflected in his testimony. Oh, it is in his testimony, and it's in the excerpt of records. It's also in the excerpt of records in his labor market survey and also in his job analysis. So he did a vocational assessment of the claimant. At that point in time, he interviewed him, and at that point in time, he even states the information that he relied upon to support the tower clerk position as being available to Mr. Kolaruotolo. Does he say at some point that that was his preferred job? I think at one point that was mentioned, but then at another point I think Mr. Kolaruotolo said otherwise because the problem with the tower clerk position is it pays $43 an hour, $1,200 over a 10-hour work shift. So if you look at the fact that this is a wage loss claim, that job is most damaging to him because it impacts his residual wage earning capacity. So it brings down the value of his claim. So what I believe is he, in the course of litigation, altered his opinions to now say, oh, I can't do that job because I have a bad back. It's interesting to note the tower clerk position, it's a sedentary position. So there was a basis for the ALJ to believe Stober's statement that this was his preferred job, even though there's other evidence that it was not his preferred job. Well, it's the easiest job on the waterfront. It's purely a sedentary position. Is this a yes or no question? I believe yes. What is your response to the argument that your opponent has made this morning about the neck issues precluding him from being able to do the job? Certainly. He sits at a desk. Ergonomically, he could sit or stand. He has a chair. He could rotate the chair. There's two monitors, and he looks at the monitors, and he inputs information. What's interesting is he works with computers. He worked with computers at the time of the injury. He has a computer at home, and he built three computers. It's light data entry work. It's a simple job. And all he does is he inputs a container number, a chassis number, and a license plate number. Okay, but you heard your opponent's argument. About the lateral rotation? Yeah, I mean, right, that this is what causes the problem, and that he testified that having done the job and obviously being very familiar with what it requires over a 10-hour period, that it caused excruciating pain such that he could not do the job on a regular basis. In my belief, that job entails minimal lateral rotation, minimal flexion and extension of the head. And basically, you just move his arm. Your belief is utterly irrelevant. I guess I'm asking what do we have in the record that contradicts the argument we heard this morning? Well, the record that we have is Howard Stauber, a vocational rehabilitation expert, found that that's a job that was in the work restrictions of Dr. Nagelberg, the treating doctor, and Dr. London, the expert retained on behalf of SSA. The administrative law judge who heard all of the evidence and reviewed all of the medical reports, well, it's interesting to note that neither of the two doctors said that he could not do that job. They gave work restrictions, no heavy lifting, no repetitive lateral rotation. The restrictions are into the record, but the restrictions did not foreclose that job. But the ALJIM remembering that very odd use of the ellipsis to cut out the neck concerns that the claimant expressed here, right? So did the ALJ ever really address head on that the neck injury is what was causing the inability? I believe he did, Your Honor. In the very first decision, he said that he could do the work of a tower clerk position. But what he said in the first decision was he thought Mr. Stauber's comments were that it was speculative as it relates to the number of days he could get that work, thus it was random. On reconsideration, the judge took a look at the evidence, took a look at the testimony of Mr. Stauber, and then said, you're right, he said three days, and I'd be speculating to the others. Right, but that goes to availability, and I'm talking about the suitability or ability to do the job. And what I'm asking, I guess, is isn't your opponent right that the ALJ never addressed head on in explaining why? I can't remember, is it a he or a she? Is the ALJ a man or a woman? Oh, I'm sorry, Larry Price. That's right. Did the ALJ ever directly explain why he thought that notwithstanding the serious neck injuries that the claimant had sustained, that he could still do the tower job notwithstanding the need to? I believe he did, Your Honor. There was a lot of testimony to that effect. I thought you were about to say that he did that in his first opinion instead of his second opinion. He did do it in his first opinion, and he said he could return to work effective the date of maximum medical care. Where in the first opinion? Can you give me the site? Sure. I definitely missed that. We're talking about the opinion of December 10th, 2013? Yes, Your Honor. Do you know where it is? It's on here. Oh, yeah, but where would that be? I don't know. Okay. Yeah, if you have the site, Andy, I'm sorry to consume your time. Oh, no, no, Your Honor, and I apologize that I don't have it readily handy. Okay. On page 26 of the Excerpt of Records, Volume 1, the judge says, Therefore, of the jobs employer identified, I conclude that Klayman is mentally capable of performing only the tower clerk position, which he has done pre-injury and which can be modified to accommodate his physical limitations. Those Excerpt of Records, 26, Volume 1. I thought you were going to find some specific reference to the neck, or at least to specific. I'm not saying that's necessary, but I thought you were saying it was there anyway, but it's not. Okay. He addresses sitting and standing on page, on ER 25. And that's what I'm looking at, Your Honor. Yeah, and that's where the ellipses is. That's why I'm, I guess that's what has bothered me, and your opponent has flagged that this morning. And I wondered what your response was. Because the ALJ focuses on the back, right? But just has taken out from that quote the neck concerns that the Klayman expressed. And curiously that. Your Honor, if I may, on page 25 of the Excerpt of Records, Volume 1, under physical and mental capabilities, the administrative law judge is commenting on at least the party's vocational experts, the physical limitations, limited range of motion, increased neck pain. I mean, at least he's at least commenting about it. Right. He mentions neck pain in that first paragraph under the title physical and mental capabilities. The very next paragraph is where the ellipses occurs. It only refers to back, and he omits the word neck. So he's acknowledged the neck pain and then omitted it from the next paragraph. I would agree with that. It seems just a little odd, doesn't it? Well, Judge Price had the benefit of hearing all the testimony, reviewing all the medical records, reviewing the deposition transcript of Ms. DeStaber, and these were the decisions that he reached. And again, these are factual credibility determinations that really shouldn't be part of Klayman's claim before this court. What about on page ER25, it says, employer identified several mechanisms by which the physical demands of the position may be modified to accompany them with reference to the excerpts. Do those excerpts help you? I'm sorry, Your Honor. You said page 25? It's got a 20. It's ER25, and it's page 22 of the opinion. Am I in the wrong one? Yes, I see it. It's right in the middle of the page. Yes, I see it. Employer identified mechanisms that would help. I would think if that included help to the neck. See, and that's all also in Howard Staber's job analysis and his labor market survey. He goes into, with specificity, what that job entails. And that's in the excerpt of records. I'm talking about physical demands being modified. Well, the position, it does allow him to sit and stand as he so desires. All right. He might not answer. Okay, thank you. Okay, thank you. Thank you, counsel. Thank you. Ms. Merrigan, I'll give you two minutes. Thank you, Your Honors. I would just follow up that to the extent that we can maybe infer that perhaps the ALJ had been considering the neck in regard to the tower clerk position, too, that doesn't suffice under the APA, which says that he needs to state his conclusions and the material facts. The ALJ incorrectly stated. Where in the APA does it say that? I'd have to get you the precise citation. I can give you the general citation of the APA off the top of my head, but not the subcite. Thank you. The ALJ, he undermined any such inference when he stated, quote, at the hearing, claimants only objectioned the tower clerk position was the amount of time he would have to sit. This complaint is cured by the ability to alter his sitting and standing at will. Thus, the only objection the ALJ was considering was the sitting issue. For whatever reason, he omitted entirely from his consideration and from his knowledge the neck issue. So I'm not sure why, but yes, Your Honors, I do not believe that that meets the APA standards. If I could touch briefly, though, in my last 45 seconds on the Fourth Circuit standard. The Fourth Circuit has held that a labor market cannot be evidenced by the production of only one job. Here we have the production of only one job, in fact, one job which is extremely popular on the waterfront and which the vocational expert admitted repeatedly that the availability of it is speculative. The speculation of it kind of drives home the Fourth Circuit's point that where there's one job, it's too much to assume that the claimant would be able to take that job. SSA has argued today that, in fact, the claimant did prefer the tower clerk work, but swapped his testimony in order to maximize his benefits. If that's true, if he really did prefer that work, then his job history would evidence how often he was able to get it. And that shows he didn't get it at all. So if, as SSA argues, that was his preferred position, that undermines the job's availability. The Fourth Circuit has a clean rule to show jobs that are available, which is the standard that the Ninth Circuit has previously stated in cases like Bumblebee and using the plural of job. The ALJ, though, has held that Kalaruotolo was credible. And so it really goes back to these omissions that the ALJ made and the assumptions in regard to what he can and can't do, despite Kalaruotolo having said that he cannot do this job, don't agree with those credibility findings. And the ALJ did not explain how it is that this claimant, who's credible, who says he cannot do this job when he tried to do it with an ADA accommodation already, is suddenly going to be able to do it now that he's had more surgeries. Thank you, Your Honors. Thank you, counsel. Thank both counsel for a helpful argument. The case is submitted.
judges: Rogers, Bybee, Watford